**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **C.M.L., an individual** | **Case No.:** |
| **Plaintiff,** | **JUDGE:** |
| **v.** | **MAGISTRATE JUDGE:** |
| **WYNDHAM HOTELS & RESORTS, INC.;** **WYNDHAM HOTEL GROUP, LLC;** **HILAND HOSPITALITY, LLC;** **CHOICE HOTELS INTERNATIONAL, INC.;** **SHRI SAIKRUPA HOSPITALITY, INC.; and** | **Demand for Jury Trial** |
| **DOES 1-10,** | |
| **Defendants** | |

1

## PLAINTIFF'S COMPLAINT

### INTRODUCTION

1. Plaintiff, C.M.L., an individual, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2015 until 2017, beginning when Plaintiff was just 16 years old. During that time, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

1. Plaintiff was trafficked in hotels owned, operated, and managed by Wyndham Hotels and Resorts, Inc.; Wyndham Hotel Group, LLC; Hiland Hospitality LLC; Choice Hotels International, Inc.; and Shri Saikrupa Hospitality, Inc.

2. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

### PARTIES

3. Plaintiff is a natural person and a resident of the State of New York.

4. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a

pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

5. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

6. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

7. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

8. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); James v. Jacobson, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXIII*, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

9. Defendant Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

10. Defendant Wyndham Hotel Group, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

11. The Wyndham franchise included the Knights Inn hotel chain from 2006 until April, 2018.

12. Defendant Hiland Hospitality is a New York limited liability company which owns and operated the Knights Inn Endwell Motel located at 2603 E Main St, Endwell, NY, during the time Plaintiff was trafficked.

13. Defendant Choice Hotels International, Inc. ("Choice") is one of the largest hotel franchising companies in the world with over 7,000 branded properties in more than forty (40) countries and territories. It is a Delaware corporation. Choice does business in a systematic and continuous manner throughout Ohio, including this District and Division.

14. Included among Choice Hotel brands is the Econo Lodge hotel chain.

15. Defendant Shri Sia Krupa Hospitality is a New York corporation which owned and operated the Econo Lodge Binghamton, located at 690 Old Front St, Binghamton, NY, during the period in which Plaintiff was trafficked.

16. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this

Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

## SEX TRAFFICKING OVERVIEW

19. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

20. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

21. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

22. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

23. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

24. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

25. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

26. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

27. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

28. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

29. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

30. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

31. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

32. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

33. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

34. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

35. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

36. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

37. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the

globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

38. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

39. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

40. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

41. When she was just 16, Plaintiff was homeless, living on the street in Upstate, New York.

42. Plaintiff was introduced to an adult man who went by the alias "M". M promised her independence and a better quality of life in exchange for performing commercial sex acts.

43. M convinced Plaintiff that he would protect her, manage the buyers, enforce payment, and transport her safely.

44. Plaintiff, naïve and underage, found herself quickly swept up into a commercial sex trafficking operation, from which she could not extract herself for two years.

45. Plaintiff's trafficker posted advertisements on Backpage.com offering Plaintiff, a minor, for commercial sex acts in and around Binghampton, New York. These advertisements included photographs of Plaintiff and descriptions of sexual services available for

purchase. Buyers responded directly to these advertisements and arranged meetings at hotel rooms rented by her trafficker.

46. Plaintiff's trafficker based his trafficking operator out of budget hotels, specifically those that would allow the operation to proceed without interruption or reports for service from local police.

47. Two hotels in particular provided friendly venues for Plaintiff's trafficker.

48. At the Econo Lodge Inn & Suites, located in Binghamton, sex trafficking was open and notorious. Many traffickers operated out of this location. Hotel employees observed this activity and failed to intervene. In fact, employees were themselves buyers of commercial sex services at the hotel.

49. The Knights Inn, located at provided an alternative setting for the same essential qualities. Hotel staff tolerated the obvious and open signs of commercial sex trafficking of Plaintiff.

50. These hotels provided the physical locations where Plaintiff's trafficking was carried out repeatedly and systematically, over a period of approximately two years.

51. Plaintiff's trafficker would have a stream of "buyers" going directly from their vehicles to the already occupied rooms for short periods of time. Throughout these stays, visitors arrived at all hours of the day and night. The conditions were such that nobody could feign ignorance of the conditions.

52. The trafficker transported Plaintiff to rooms at the hotel for the purpose of engaging in unlawful commercial sex acts with adult men in exchange for money. Her trafficker also used the location to provide Plaintiff with drugs and alcohol. The hotel rooms were not incidental to the trafficking venture; they were essential instrumentalities that enabled buyers to access Plaintiff in a private, enclosed, and commercial setting.

53. Over time, the conditions of her exploitation escalated. She was socially isolated, subject to constant surveillance of her trafficker, and lived under constant fear of violence.

54. Plaintiff was repeatedly brought to this hotel under the control of this trafficker. Plaintiff remained under constant supervision and control by her trafficker, as he observed from his vehicle. She could not move freely about the property or communicate directly with hotel staff, even though she spent weeks continuously located at a single location.

55. The pattern was consistent and repetitive. The same type of activity occurred during multiple stays at this property, creating a sustained and observable course of conduct indicative of sex trafficking over a two-year period.

56. The Defendant hotels provided anonymity, no scrutiny, and convenient access for buyers responding to online advertisements. The layout and operation of the properties allowed a steady stream of unrelated adult men to access Plaintiff's room with little to no interference.

57. Inside the hotel rooms, Plaintiff was compelled to engage in commercial sex acts through psychological coercion, drugs and alcohol, and emotional pressure, intimidation, and control, which was specific to her naïve expectations of a romantic partnership.

58. Plaintiff did not consent to these acts. The hotel rooms served as the primary sites of repeated sexual assault and exploitation over an extended period of years which continued into adulthood.

59. Defendants knew that Plaintiff was being subjected to sex trafficking on their premises. Despite this knowledge, rooms continued to be rented, payments were accepted, and no intervention occurred.

60. By continuing to rent rooms under these circumstances, Defendants provided substantial assistance to the trafficking venture and financially benefited from the repeated commercial exploitation of a minor on their property.

61. As a direct and proximate result of being trafficked as a minor at these Defendant hotel locations, Plaintiff suffered severe and lasting physical and psychological injuries. Beyond the physical harm, Plaintiff continues to suffer profound emotional trauma, psychological injury, and lasting relational damage stemming from prolonged sexual exploitation during her adolescence.

62. There were overt and obvious signs of Plaintiff's trafficking, including the constant foot traffic of adult men coming and going to young girl's room.  Plaintiff was stood out with long red hair, thin, obviously young at 5'10".

63. Plaintiff exhibited clear indicators of trafficking in that she dressed as provocatively like a sex worker with short shorts and spaghetti string top and lots of unrelated men going in her room for short periods of time before leaving. Plaintiff is informed and believes police

raided the hotels many times before and during the times she was there for the rampant prostitution activity at the properties.

64. These indicators matched well-recognized "red flags" of human trafficking in the hotel industry and were known to each Defendant to be signs of sex trafficking in a hotel environment.

65. As a result of the exploitation, Plaintiff has suffered significant and lasting physical and psychological harm. She is experiencing infertility related to medical conditions she experienced as a result of being trafficked. The effects of exploitation continue to impact her daily life.

**Sex Trafficking at Wyndham properties**

66. The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to taking steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[6]

67. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[7]

68. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham

---

[6]https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative  harmlessness of the Code itself."')
[7] https://endsexualexploitation.org/wyndham/

monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

69. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Wyndham property hotel in California.[8]

70. In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Wyndham property hotel.[9]

71. In 2011, an MS-13 gang member was indicted for trafficking girls at a Wyndham property hotel Motel near Washington, D.C.[10]

72. In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Wyndham property hotel.[11]

73. In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Wyndham property hotel Motel in Oklahoma.[12]

74. A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Wyndham property hotel Motel.[13]

75. In 2013, a man was arrested at a Wyndham property hotel in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[14]

---

[8]https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[9] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm.

[10] https://www.thepublicdiscourse.com/2011/10/4034/

[11]https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[12] Man faces new sex-trafficking charges, Tulsa World (Oklahoma) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062ala-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[13]https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[14] https://turnto10.com/archive/new-details-in-ardrey-sex-traficing-investigation

76. In 2013, a Wyndham property hotel motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[15]

77. In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Wyndham property motel in Texas.[16]

78. In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Wyndham property hotel.[17]

79. In 2014, a man was charged in connection with a Lansing, MI-based sex trafficking ring involving four 15 to 18-year-old girls who would meet customers at the Super 8 in Lansing.[18]

80. In 2015, a Texas man was arrested and charged with human trafficking and second-degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Wyndham property hotel.[19]

81. Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same.

82. For example, an August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[20]

---

[15]  https://www.cbsnews.com/news/mo-man-located-with-missing-mass-teen-charged-with-sex-trafficking-report-says/

[16] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[17] https://www.pressherald.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/

[18] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/

[19] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/

[20] https://www.tripadvisor.com/ShowUserReviews-g60950-d74409-r21067299-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

83. A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile ... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines ... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[21]

84. A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[22]

85. A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[23]

86. An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute .... or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[24]

87. A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual

[21]https://www.tripadvisor.com/ShowUserReviews-g32655-d235134-r56967752-Super_8_by_Wyndham_Hollywood_LA_Area-Los_Angeles_California.html
[22]https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-Norfolk:Chesapeake-Bay.h7202.Hotel-Reviews
[23]https://www.tripadvisor.com/Hotel_Review-g30196-d109015-ReviewsSuper_8by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[24] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE! !"[25]

88. An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[26]

89. An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[27]

90. A February 2013 review of a Wyndham branded property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[28]

[25] https://www.tripadvisor.ie/ShowUserReviews-g34378-d113362-r125347054-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[26] https://www.tripadvisor.com/ShowUserReviews-g56003-d240483-r128310734-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

[27] https://www.tripadvisor.com/ShowUserReviews-g34378-d113362-r143852088-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[28] https://www.tripadvisor.com/ShowUserReviews-g43493-d247863-r153318041-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

91. An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[29]

92. These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels.

93. Moreover, on information and belief, Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

94. Consistent with other Wyndham properties, Knights Inn Endwell is the subject of numerous online reviews describing the drug activity and sex trafficking at the Endwell, New York location.

95. In September 2009, a Knights Inn Endwell customer posted a review on Tripadvisor saying, "A Burn all your clothes after staying here motel. You don't have to read any more than the headline to tell how bad this place was. I went up with a few buddies to hang out at our old stomping grounds of "O's". I saw this was a nearby place, and for the low price... I made the reservation for a room. Lets just say phrases like "roach motel", "bottom of the barrel", and "skid-mark sheets" came to mind. The place was so disgustingly, disgusting... that I found it troubling just to rub one out in the room. Plus, I believe there was drug and possible sex activity in the adjoining room. After leaving, I burned all my clothes and shaved off all my body hair. Yes... its THAT BAD!"

96. In January 2012, a Knights Inn Endwell customer posted a review on Tripadvisor saying, "Nastiest hotel I've ever stayed in. Omg. So we were with a band. That doesn't mean we are disgusting people. This place is beyond words. Mold on ceiling, walls, around toilets. 70s wallpaper peeling off the walls because of water leakage. Each of our 3 rooms had holes in the walls or doors, like a punch or kick. The once pink carpets are caked with crusty mysterious substances. The lamps don't have lightbulbs. The shower curtain had a nice layer of mold across the bottom. In our room the walls were not connected to the ceiling like one

---

[29]https://www.tripadvisor.com/ShowUserReviews-g34856-d217054-r157802203-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

side of the building is sinking. I've been in way better places for less. Don't waste your money unless youre looking for a good place to buy drugs. Btw this place comes with its own dealer in the lot. Damn."

97. In 2016, a Knights Inn Endwell customer posted a review on Google saying, "The knights inn in Endwell NY was the worse experience ever. The house keeping sucked. First room we received had toilet paper wod in bath tub. The last room upstairs was not vacuumed sun flower seeds along the base board. No phone in room non stop drug trafficking non stop fighting. Call front desk no answer. Pretty sad when state troopers says that what you get for staying here.. :( they don't even deserve one star but couldn't make a half"

98. In 2018, a Knights Inn Endwell customer posted a review on Google saying, "Do not stay here. They have bed bugs bad. They have a contract with DSS so they have drug users and sellers there all the time and everything else that comes with the scum of broome county"

99. In 2018, a Knights Inn Endwell customer posted a review on Google saying, "Do NOT GO here. Drugs hookers dirty. Much better options close by"

100. In 2018, a Knights Inn Endwell customer posted a review on Google saying, "I want to be clear: I've never stayed here. But this place is between where I work and live, so I pass it every day. Just a quick glance at the outside tells the traveler, "Keep driving and find someplace else to stay." One reviewer wrote, "Of course it looks old, it was built in the 1960's or 1970's." Nope, try the late 1980's or early 1990's, if I remember correctly. It used to be called "Kings Inn" when it first opened. It looked nice and there appeared to be constant maintenance done on the building. Then it must have changed hands when it became "Knight's Inn." It looks like it has fallen into disrepair. I knew someone who lived there long-term, just like in that TV show "My Name is Earl." Eventually she couldn't pay her rent and ended up homeless, living in a tent on an island in the middle of the Susquahanna River. I would suspect the majority of the long-term residents live similarly precarious lives. Ask yourself, do you really want to book a night at some place like this-- basically a welfare hotel--when there are better options? I'm assuming the positive reviews are written by the owner. Life is short--I know $45 a night sounds appealing, but spend

twice that amount and sleep in a far better place. The only reason to stay here is if you are planning to spend the night smoking crack with a hooker."

101. In 2018, a Knights Inn Endwell customer posted a review on Google saying, "I have given one star, only because I can't review to 0 stars. We were in town for a local pool tournament, and booked here. Much to our surprise, when we returned to our room after 14 hours of pool, we found drug paraphernalia on our nightstand. I don't know if this was left by a previous guest, or one of the cleaning staff, but does it matter? We brought this to the attention of management, whose response was "Sorry". Never again will I stay with knights inn, here or any where else."

102. In June 2019, a Knights Inn Endwell customer posted a review on Expedia saying, "Very unsafe. A man came into my room and i had call 911. Drug use was evident"

103. In August 2019, a Knights Inn Endwell customer posted a review on Expedia saying, "This is the most disgusting filthy hotel I've ever stayed at. It is a drug user / dealer location. The hall into the ice machine hasn't been cleaned for ever. Looked like a homeless bedroom near ice machine. Black mold all over in shower. Had to keep shoes on in room after stepping on sharp exposed nails on tile / carpet joint. Went to breakfast and there was fresh blood on floor in hall to dining room. Drug user looks to have leaked blood. Sure the woman behind desk could hook anyone up with illegal substances. Skipped breakfast after seeing the filthy dining room. Terrible. experience. Should never have spent money on non-refundable location. Don't stay here!"

104. Finally, as recently as a few months ago, a Knights Inn Endwell customer posted a review on Google saying, " A horrible night all dirty a bad smell. The window didn't have insurance, I had to put a wood on it for safety!! It seems that there are traffickers in the parking lot, it touched me. Running out of the motel because at 2 am a man knocking on my door and. He was walking down the hall. Very insecure. I had to sleep in the car".

**Sex Trafficking at Choice Hotels**

105. For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking, which tragically occurs on its hotel properties

throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at the Rodeway Inn and Quality Inn hotel brands that form the basis of this complaint. For example:

106. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice-branded hotel, in Fayetteville, North Carolina.[30] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[31] It was only after this horrific incident that Defendant Choice started to publicize a need for change.

107. In December of 2009, authorities found a man was attempting to use a Comfort Suites in Orlando, Florida, to sex traffic a fifteen-year-old girl. He was arrested when the fifteen-year-old girl ran into a store to contact authorities.[32]

108. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[33] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure the hotels were following the protocols.[34]

109. In May of 2012, two men were charged with promoting prostitution and engaging in prostitution inside of a Comfort Suites hotel room in Asbury Park, New Jersey.[35]

---

[30] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

[31] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[32] *Cops: Man Tried to Sell Girl, 15, for Sex,* The Orlando Sentinel, Dec. 23, 2009.

[33] *See* Choice Hotels, *Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).

[34] *See* Choice Hotels, *Human Rights Policy, supra,* n.30.

[35] 2 Men Charged with Prostitution, Asbury Park Press, May 19, 2012, at pg B3.

110. In 2012, an anti-trafficking coalition alerted Defendant Choice of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[36]

111. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues at its branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews show the pervasiveness of customer-reported sex trafficking and guest safety issues on Choice-branded properties and Defendant Choice's inattentiveness, for example

112. In April of 2011, a female escort was choked and robbed by three men in a Choice branded Quality Inn hotel room in Plantation, Florida.[37]

113. In February of 2012, a fourteen-year-old girl was found at a Choice branded Quality Inn in Oakland, Pennsylvania after missing for a year when authorities set up a sting operation into internet advertisement.[38]

114. In March of 2012, two men were arrested for sex trafficking two minors at a Choice branded Quality Inn hotel in Houston, Texas.[39]

115. In November 2012, two women and one man were arrested at a Choice branded Quality Inn in Boca Raton, Florida after authorities were seeking to crack down on human trafficking.[40]

116. In November of 2012, a reviewer described a Choice branded Quality Inn in Jacksonville, Florida as follows: "As we pull up we have a perfect first impression of one of the local " working " girls heading out to make a buck off a tractor trailer driver. The room had dirty towels on the floor in the corner but the staff was great."[41]

---

[36] *See* Christian Brothers Investment Services, London Olympics Report Release, *available at* https://cbisonline.com/us/london-olympics-report-release/.

[37] *Escorts Target of Spree*, The Miami Herald, Jun. 06, 2011, at pg 20.

[38] *Missing Teen Found During Prostitution Bust*, Pittsburgh Post-Gazette, Feb. 12,2012, at pg 12.

[39] *Two Men Accused of Child Sex Violations Await Trials*, The Odessa American, Apr. 14, 2012, at pg A1 and A4.

[40] *Police Arrest 16 in Prostitution Sting*, The Palm Beach Post, Nov. 23, 2012, at pg B010.

[41] Review of Comfort Suites Orange Park Jacksonville, *available at* https://www.orbitz.com/Jacksonville-Hotels-Quality-Inn-Orange-Park-Jacksonville.h10686.Hotel-Information

117. Online reviews of the Econo Lodge Binghamton property further demonstrate the open and obvious signs of drug and sex trafficking:

118. In July 2016, An Econo Lodge Inn & Suites customer posted a review on Tripadvisor saying, "Terrible stay Sink with a fist size hole in it. Other room had a tick in the bed, 3rd room bathroom door would not shut. Not very clean. Remote for TV did not work. Smell of marijuana outside office. Looked like a drug deal outside, others living here getting mail at the front desk. I would not ever stay here again."

119. In August 2016, An Econo Lodge Inn & Suites customer posted a review on Tripadvisor saying, "DISGUSTING When we pulled in there was a hooker conducting a deal right out in the open. The roof was half caved in and the guy at the front desk looked annoyed that we were there late. The carpet appeared as though it hadn't been vacuumed in ten years, and the stench in the hallway was unbearable. The linens were sticky and the box springs had a brown hue that was just absolutely abhorrent. I slept on top of a towel and used my sweatshirt as a blanket. We also did not avail of the free breakfast because we didn't want to spend a minute longer in that roach motel than we had to. Sleeping outdoors would have been a million times better, this place is TERRIBLE!"

120. In 2017, An Econo Lodge Inn & Suites customer posted a review on Google saying, "Echono lodge was horrible i went to visit my mother there as she was staying for a night for work and its infested with drugs and.smells like pot as soon as you walk in rooms are semi.decent size i wouldnt ever stay there"

121. In August 2018, An Econo Lodge Inn & Suites customer posted a review on Tripadvisor saying, "Don't stay here!!! Disgusting dump! Air conditioning unit was filthy. Bathtub/Shower moldy. Carpet filthy. Bed sheets looked like they had not been changed. TV remote didn't work. Homeless person or what may have been a prostitute was loitering at the entrance along with her belongings piled on the grass. Non Smoking room reeked of smoke, so did the hallways. NEVER AGAIN!! I wouldn't even give it one star, but there isn't a ZERO!!!!"

122. In 2019, An Econo Lodge Inn & Suites customer posted a review on Google saying, "One of the worst motel I have stayed in. The advertise a Queen size bed but you get a

Full size bed in your room. The staff were helpful though. So helpful that when I asked about the bed and it's size....she just smiled and said "Sorry about that. Enjoy your stay!". Really how can I enjoy my stay when me and my fiance had to sleep like we were on a Twin size bed...smh. The they advertise BREAKFAST! REALLY...just because you offer juice and a danish, that is not breakfast. I have never had a worse experience with any other hotel or motel. This motel was worse than the Fairview Inn in Delaware. And that is a hooker hotel...smh."

123. On February 2019, An Econo Lodge Inn & Suites customer posted a review on Yelp saying, "I stay in about 100 hotel rooms a night per year. This is the absolutely filthiest place I have ever stayed. Lock to my room was broken - stains everywhere on the carpet and sheets. Housekeeping didn't come on some days. Most importantly there are people doing drugs in the place - you can smell it in the hallways. Nice staff but the facility is really bad."

**Actual and Constructive Knowledge**

124. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

125. Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with no effort to conceal their activities, based on an implicit, if not explicit, understanding that their conduct would not be questioned or disrupted by the hotels.

126. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and

other conduct consistent with the well-established indicators of sex trafficking described above.

127. During the period that Plaintiff was trafficked, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff's trafficker or a "buyer" would pay for the room with cash. At Knights Inn they required an ID but didn't care who's ID it was. Plaintiff would rent the room using a buyer's ID, then she would pay daily for the room with cash for as long as she wanted with this buyer's ID being the one the hotel kept on file.

- Plaintiff would have few or no personal items when checking in.

- Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.

- Plaintiff is informed and believes that the son of the owner of Knights Inn, who worked at the hotel, paid prostitute for sex at the hotel.

- One time this same staff person believed to be the owner's son, upon a customer leaving Plaintiff's hotel room said to Plaintiff something to the effect, "can I be next?"

128. Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

129. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

130. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

131. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

132. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

133. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

24

134. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

   a. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

   c. accommodating specific requests made by traffickers;

   d. allowing "buyers" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking.  At Econo Lodge the locks on a couple side doors never worked and buyers could enter and exit through the front entrance without any question;

   e. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   f. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

   h. providing this trafficking with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

135. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

136. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Wyndham Franchisor and Franchisee Relationship**

137. The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Knight Inn Endwell named in this suit when operating the hotels because these acts and omissions were committed in the course and scope of employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the subject Knights Inn.

138. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject Knights Inn that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff, as follows:

    a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Knights Inn, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

    b. The Wyndham Defendants retained control over when its branded hotels, including the Subject Knights Inn, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

    c. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants.

d. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

e. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

f. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

g. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

h. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

i. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

j. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Knights Inn;

k. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Knights Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Knights Inn;

27

l.  The Wyndham Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Subject Knights Inn including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

m.  Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Knights Inn, including trends that would reveal patterns consistent with human trafficking.

139. The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Knights Inn Endwell location by, among other things:

The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

a.  The Wyndham Defendants directly made reservations for rooms at the Subject Knights Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

b.  The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Knights Inn through detailed policies that it established regarding use of this "do not rent" system;

c.  The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and a rewards program;

d.  The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

e.  The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

f.  The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Knights Inn;

g.  The Wyndham Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Knights Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

h.  The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

140. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Knights Inn, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

141. The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge Franchisee Defendant and the staff at the Subject Knights Inn, which are the Wyndham Defendants' actual agents or subagents.

142. The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Knights Inn through the franchising agreement, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

143. The Wyndham Defendants obscure the full extent of control they exercise over Franchisee Defendant by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.  Upon information and belief, the standards that the Wyndham Defendants imposed on Franchisee Defendant:

a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Knights Inn;

29

b. Covered virtually all aspects of hotel operations, including internal operating functions;

c. Dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Knights Inn Endwell; and

d. Significantly exceeded what was necessary for the Wyndham Defendants to protect their registered trademarks.

144. In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Knights Inn, including the following ways:

a. The Wyndham Defendants required Franchisee and management of the Subject Knights Inn to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b. The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Knights Inn and at locations selected by the Wyndham Defendants;

c. The Wyndham Defendants required all hotel staff to participate in training they created through an online learning platform they controlled and maintained;

d.  The Wyndham Defendants controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Franchisee was required to purchase to operate the Subject Knights Inn, the Wyndham Defendants designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor;

g. The Wyndham Defendants required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the Subject Knights Inn. Franchisee was required to install and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. The Wyndham Defendants set required staffing levels for the Subject Knights Inn;

i. The Wyndham Defendants established detailed job descriptions for all positions at the Subject Knights Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Wyndham Defendants set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions;

k. The Wyndham Defendants provided benefits for employees of Franchisee;

l. Wyndham Defendants required Franchisee to use a customer resource management program maintained and operated by the Wyndham Defendants;

m. The Wyndham Defendants controlled channels for guests to report complaints or Provide feedback regarding the Subject Knights Inn and directly participated in the response and/or supervised the response to customer complaints or other feedback.

145. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

a. The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Knights Inn;

b. The Wyndham Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

c. The Wyndham Defendants set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to

bill Franchisee directly for that insurance if the Wyndham Defendants determined that Franchisee has not purchased adequate insurance;

d. The Wyndham Defendants regularly audited the books and records of Franchisee;

e. The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Knights Inn;

f. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Knights Inn;

g. The Wyndham Defendants controlled all marketing for the Subject Knights Inn and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

h. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

i. The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Knights Inn through detailed information and extensive reports that they obtained through the property management system and other software systems they required Franchisee to use; and

j. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

146. Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Knights Inn Endwell.

**Choice Hotels Franchisor and Franchisee Relationship**

147. Choice was in a franchise and agency relationship with Defendant Shri Sia Krupa Hospitality, Inc., at the Econo Lodge Inn & Suites Binghamton location, offering public

lodging services in those hotels. This agency relationship was established through Defendant Choice's exercise of an ongoing and systemic right of control over the Econo Lodge Inn & Suites hotel by Defendant Choice's operations, including the means and methods of how Econo Lodge Inn & Suites conducted daily business through one or more of the following actions:

a. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Choice;

b. providing reservation platforms where payment modes, guest names, travel habits, or history, and suspicious reservations would suggest trafficking;

c. providing new hire orientation on human rights and corporate responsibility;

d. providing training and education to Econo Lodge Inn & Suites branded hotels through webinars, seminars, conferences, and online portals;

e. providing and controlling customer review and response platforms;

f. hosting online bookings on Defendant Choice's domain;

g. requiring Econo Lodge Inn & Suites branded hotel to use Defendant Choice's customer rewards program;

h. requiring Econo Lodge Inn & Suites branded hotel to use Defendant Choice's property management software;

i. requiring Econo Lodge Inn & Suites branded hotel to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

j. providing IT support for all property management systems, owned, operated, and required by Choice;

k. setting employee wages;

l. making employment decisions;

m. advertising for employment;

n. sharing profits;

o. requiring Econo Lodge Inn & Suites branded hotel to use Defendant Choice's property management software;

p.  requiring Econo Lodge Inn & Suites branded hotel to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q.  providing IT support for all property management systems, owned, operated and required by Choice;

r.  standardized training methods for employees;

s.  building and maintaining the facility in a manner specified by the owner;

t.  standardized or strict rules of operation;

u.  regular inspection of the facility and operation by owner;

v.  fixing prices; or

w.  other actions that deprive Econo Lodge Inn & Suites branded hotel of independence in business operations

148. An apparent agency also exists between Defendant Choice and Econo Lodge Inn & Suites hotel. Defendant Choice held out the owners of the Econo Lodge Inn & Suites branded hotel to the public as possessing the authority to act on its behalf. Defendant Choice clothed them with apparent authority to act for Defendant Choice in the following ways: by requiring the use of Choice signs, providing Choice branded stationery, requiring the use of Choice's website, and Choice's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Choice guest rewards programs. On information and belief, Defendant Choice's conduct reasonably led Plaintiff's trafficker to believe that the Econo Lodge Inn & Suites hotel had the authority it purported to have, and Plaintiff was injured as a result.

149. As the principal and as a hotel operator, Choice controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Econo Lodge Inn & Suites hotel where Plaintiff was trafficked.

150. Econo Lodge Inn & Suites hotel website is hosted at Choice's domain www.choicehotels.com.

151. When staying at Choice branded hotels, guests receive Choice Privileges (Choice rewards) for bookings.

152. Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Econo Lodge Inn & Suites hotel where Plaintiff was trafficked for sex.

153. Defendant Choice exercises day-to-day control over the Econo Lodge Inn & Suites hotel, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Econo Lodge Inn & Suites hotel, through its brand standards and retains control over the Econo Lodge Inn & Suites hotel through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

154. Choice makes decisions that directly impact the operations and maintenance of their branded hotels, including the Econo Lodge Inn & Suites hotel.

155. Choice is the principal in an agency relationship with the owners of Econo Lodge Inn & Suites hotel. In addition to Choice's liability under TVPRA section 1595, Choice is vicariously liable for the acts and/or omissions of the staff at its Econo Lodge Inn & Suites hotel.

156. In addition to an actual agency relationship, Defendant Choice has ratified the actions and inactions of Defendant Shri Sia Krupa Hospitality, Inc.

157. Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Econo Lodge Inn & Suites hotel where the Plaintiff was trafficked for sex. Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., each share the common policies and practices complained of herein.

158. Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

159. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., are separately and jointly responsible for compliance with all applicable laws.

160. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Defendant Shri Sia Krupa Hospitality, Inc., are jointly and severally liable for any damage caused by their employees.

161. Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., are considered employers under federal labor regulations.

162. Upon information and belief, Choice controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked.

163. At all relevant times, Defendant Shri Sia Krupa Hospitality, Inc., was involved in the staffing and operation of the Econo Lodge Inn & Suites hotel, where Plaintiff was trafficked for sex. Defendant Shri Sia Krupa Hospitality, Inc., managed the hotel pursuant to a franchise agreement with Defendant Choice. Directly and through its franchise agreement with Defendant Choice, Defendant Shri Sia Krupa Hospitality, Inc., directly offered public lodging services at the Econo Lodge Inn & Suites hotel, where Plaintiff was trafficked for sex.

164. As a hotel owner, Defendant Shri Sia Krupa Hospitality, Inc., participated in a hotel operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel pursuant to Defendant Choice's brand standards, franchise agreements, licensing agreements, and operating agreements.

165. At all relevant times, Defendant Choice managed, supervised, directed, and/or operated the Econo Lodge Inn & Suites hotel through its brand standards, franchise agreement, and franchise disclosure documents. Because Choice operated the Econo Lodge Inn & Suites

36

hotel where Plaintiff was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals Plaintiff was victimized in.

166. Defendant Choice and Defendant Shri Sia Krupa Hospitality, Inc., participated in a hotel operating venture in connection with the management and operation of the Econo Lodge Inn & Suites hotel, involving risk and potential profit.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

167. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

168. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

**Claim 1: Wyndham and Hiland Hospitality Liability**

**Knowingly Benefited**

169. The Wyndham defendants and Hiland Hospitality LLC knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

170. The Wyndham defendants and Hiland fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

171. Moreover, the Wyndham defendants were involved in a business venture with Hiland. to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

172. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

173. Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

174. The Wyndham Defendants exercise of day-to-day control over the Wyndham properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

38

**Claim 2: Choice and Shri Saikrupa Hospitality, Inc. Liability**

**Knowingly Benefited**

175. The Choice defendants and defendant Shri Saikrupa Hospitality, Inc. knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

176. The Choice defendants and defendant Shri Saikrupa Hospitality, Inc. fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

177. Moreover, the Choice defendants were involved in a business venture with defendant Shri Saikrupa Hospitality, Inc. to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

178. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

179. Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

180. The Choice Defendants exercise of day-to-day control over the Choice properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies;

39

and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

## SECOND CAUSE OF ACTION: CAVRA
Child Abuse Victims Rights Act ("CAVRA")
18 U.S.C. § 2255 (against all defendants)

181. Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

182. Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

183. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## THIRD CAUSE OF ACTION: NEGLIGENCE
(against all defendants)

184. These defendants have a heightened duty of care to invitees, such as Plaintiff, who stay at their hotels.

185. As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' hotels from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized by crimes perpetrated by third parties on the premises and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

186. Additionally, the franchisors are vicariously liable for the negligence of its agents and franchisees.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

By:    /s/ Penny Barrick
       Penny L. Barrick, (0074110)
       Steven C. Babin, Jr. (0093584)
       **Babin Law, LLC**
       10 W Broad Street
       Suite 900
       Columbus, Ohio 43215
       Phone: 614.761.8800
       Direct: 614.372.6404
       Cell: 614.747.6184
       Fax: 614.706.1775
       penny.barrick@babinlaws.com
       steven.babin@babinlaws.com
       *Counsel for Plaintiff*